UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Andres Galindo, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21 CV 1822 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| Steve Piper and Sons, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Andres Galindo, Andres Galindo, Jr., Juan Ontiveros, and Armando Nicasio sued their employer, Steve Piper and Sons, Inc., on behalf of themselves and other current and former employees for violations of the Fair Labor Standards Act. After a dispute arose about Andres Galindo's status as an exempt or non-exempt employee within the meaning of the FLSA—and thus his ability to serve as a representative Plaintiff—the Court held a bench trial to resolve the question of his status. In accordance with Federal Rule of Civil Procedure 52(a), this Memorandum Opinion and Order reflects the Court's Findings of Fact and Conclusions of Law on the issue.

I. **Factual Background & Procedural History**[1]

Piper & Sons, Inc. provides tree, firewood, and mulch services. Andres Galindo worked for Piper from 1993 until early 2021, when he claims he was fired. On April 6, 2021, Galindo sued Piper, on behalf of himself and all others similarly situated,

---

[1] The Court makes factual findings below, as well as in the discussion and analysis section, section II.

alleging that the company had paid him in a manner to avoid having to pay him overtime, in violation of the Fair Labor Standards Act (FLSA) and the Illinois Minimum Wage Law. *See* [1]. Galindo filed an amended complaint June 4, 2021, which did not change much in terms of the substance of the claims. *See* [8]. On December 13, 2021, Galindo again amended, this time adding three additional named Plaintiffs (his son, Andres Galindo, Jr.[2]; Juan C. Ontiveros; and Armando Nicasio) and also adding allegations concerning the specific ways in which Piper allegedly violated both the FLSA and the IMWL. *See* [30]. The four named Plaintiffs filed a third amended complaint on April 16, 2022, [70], and a fourth amended complaint on June 16, 2022, [90], asserting claims for violation of the FLSA and IMWL on behalf of all Piper employees who were not compensated for overtime at time and a half and who were not compensated at the federal minimum wage rate of $7.25 per hour.

During the litigation, Plaintiffs moved to certify a class and collective action. At some point, Piper challenged Galindo's status as a covered employee under the FLSA. In Piper's view, Galindo was a salaried, exempt employee and thus an improper representative of the class on behalf of which Plaintiffs sought to sue. By March 29, 2023, when Plaintiffs filed a supplemental motion to certify, [169], Plaintiffs had dropped Galindo from the motion, though he remained a part of the suit and remained a named Plaintiff.

---

[2] To avoid confusion, the Court refers to Andres Galindo as "Galindo" and Andres Galindo, Jr. as "Junior."

2

Ultimately, the parties asked the Court to sever Galindo's claims from the remainder of the class and to set the matter for a trial to determine Galindo's status under the FLSA. *See* [194]. Because the severance made sense only if Galindo was in fact exempt, the Court set the matter, by agreement, for a bifurcated bench trial on June 24, 2024 on the question of his status.

The Court held the bench trial on June 24 and 26, 2024. Counsel argued the matter, and the parties presented several witnesses and stipulations. The Court heard from Galindo and Steve Piper, as well as three other laborer employees (Alfredo Nicacio, Fermin Carranza, and Junior) and Piper's office manager, Holly Morlock.

## II. Factual Findings & Legal Analysis

Galindo claims Piper failed to pay him minimum wage and also failed to pay him overtime. Galindo's overtime claim against Piper remains predicated upon his allegation that Piper misclassified him as a salaried employee, and therefore did not pay him the overtime rate for overtime hours worked, in violation of the FLSA. For its part, Piper claims that Galindo was, at all times, an exempt management employee subject to the executive exemption, 29 C.R.F. § 541.100.[3]

### A. Galindo's Claims

The Fair Labor Standards Act precludes employers from employing individuals "for a workweek longer than forty hours unless such employee receives compensation"

---

[3] At the pretrial conference, Piper appeared to invoke the highly compensated employee exemption, 29 C.F.R. § 541.601, in addition to the executive exemption. But Piper dropped any allegation relating to the highly compensated employee at the outset of the trial, electing to proceed solely on the executive exemption. [228] at 3.

for his excess hours "at a rate not less than one and one-half times the regular rate." 29 U.S.C.A. § 207(a). Thus, to prevail on his claim that Piper failed to pay him overtime compensation, Galindo must show that he worked more than forty hours per week and that Piper failed to pay him overtime at the proper rate.

Galindo testified that, in the 2018, 2019, 2020, 2021 timeframe, he worked 50 to 55 hours a week. [228] at 30. The parties stipulated that Piper's work revolved around two seasons: "firewood season" (which ran from approximately Labor Day until January or February), and "mulch season" (which ran from mid-March until the end of September). *See* Piper Stipulation No. 3, [228] at 39. Galindo testified that, during mulch season, he normally worked 10 to 11 hours a day, and sometimes 12 hours. [228] at 36. He testified that he continued to make mulch in firewood season; Galindo would typically spend one or two hours a day making mulch in firewood season and, on those days, he would also perform certain mechanical work for Piper, such as fixing any machinery used in making firewood and fixing the trucks that delivered the firewood. *Id.* at 39–40, 44–45. The daily timesheets introduced at trial confirm that Galindo routinely worked 11– or 12–hour days, *see* Agreed Exhibit 6.

The parties also agree that Piper never paid Galindo overtime per se—that is, Piper never compensated him for hours at a rate that was time-and-a-half his normal rate. The parties stipulated that "Plaintiff was never paid time and one-half for hours worked over 40." [228] at 154. But it does appear that Piper paid Galindo something beyond his normal 40-hour per week rate. The parties' Agreed Exhibit 3, Galindo's earnings record, shows that he worked 40 hours each week from April 6, 2018 through

March 19, 2021, and received pay at a set rate for that time. But Piper also paid Galindo an additional sum each week, which Piper characterized as a "merit check." Adding the two together, there can be no question that, whatever rate Piper paid Galindo, his pay always significantly exceeded any applicable minimum wage rates.[4] The sole question remains whether Piper was required to pay Galindo overtime pay at an overtime rate.

### B.    Galindo's FLSA Status

Piper claims that it classified Galindo as a salaried management employee, exempting him from the FLSA's overtime pay requirements.

Under the FLSA, an employer must pay an employee at least 1.5 times his regular rate for any time the employee spends working more than 40 hours a week. 29 U.S.C. § 207(a)(1). That rule does not apply to employees in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). An executive employee is someone: (1) who is paid on a salary basis of not less than $684 per week; (2) whose primary duty is management; (3) who regularly directs the work of at least two other employees; and (4) who has the authority to hire or fire, or whose recommendations about hiring, firing, or promotion are given "particular weight." 29 C.F.R. § 541.100(a). It is the "employer's burden to establish that an employee is an

---

[4] To the extent the parties seek a determination as to whether Galindo could appropriately represent the class in any minimum wage claims, the answer is no. The parties stipulated that Galindo earned wages and bonuses totaling $86,827.14 in 2019 and $83,698.58 in 2020; at $7.25 per hour, he would have had to work 11,976 hours (230 per week) in 2019 and 11,544 hours in 2020 (222 hours per week), an impossibility, given that there are just 168 hours in a week. More fundamentally, Galindo testified that he worked 50 to 55 hours a week during this timeframe, [228] at 30, which would put his hourly pay at $30.35/hour in 2019 and $29.26/hour in 2020, assuming he worked 55 hours per week for all 52 weeks of those years. As a factual and legal matter, the evidence undermines any minimum wage claim by Galindo, and he would thus not be an appropriate representative for such a claim.

executive." *Kellar v. Summit Seating Inc.,* 664 F.3d 169, 173 (7th Cir. 2011) (citing *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 (1974)).

The record shows definitively that Galindo earned well north of $684 per week. The parties stipulate that Galindo earned wages and bonuses totaling $86,827.14 in 2019 and $83,698.58 in 2020; his weekly pay thus significantly exceeded the executive exemption floor (on a 52–week basis his pay would be $1,669.75/week for 2019 and $1,609.59/week in 2020). But the parties dispute whether Galindo was paid on a salaried or hourly basis.

Certainly, Agreed Exhibit 3 indicates that Galindo was salaried: Piper paid Galindo the same amount each week and attributed 40 hours to him each week, regardless of how many hours he actually worked. Exhibit 3 also shows that Piper gave Galindo regular raises. Piper's ADP payroll records confirm that Piper paid Galindo for 40 hours of work every week, except for the period beginning November 19, 2018 and ending November 25, 2018, when the company paid Galindo for 30.5 hours of work because of Thanksgiving.[5] *See* Agreed Exhibit 5 at p. 000099. Piper thus paid Galindo a base rate each week. In addition, Piper also paid Galindo using a "merit check" each week, and that payment amount varied from week to week. *See* Agreed Exhibit 5.

---

[5] Deducting pay for a holiday is not inconsistent with salaried status. *See, e,g, Strait v. Belcan Eng'g Grp., Inc.,* 911 F. Supp. 2d 709, 735 (N.D. Ill. 2012) (finding employees salaried, despite payroll deductions for holidays).

Holly Morlock testified that, since she arrived at the company in February 2017, the company has paid Galindo on a salary basis. She testified that, although Galindo started as an hourly employee, he has been a salaried employee since at least February 2017.

On the stand, Galindo testified to the opposite: he testified that Piper paid him on an hourly basis. In fact, he testified that he asked Piper to pay him on a salary basis "about eight years ago," and Piper said no. [228] at 26–29. But Galindo also testified that Piper paid him for holidays and when he was too sick to report to work, [228] at 80–81. That arrangement remains consistent with salaried status, not hourly status, and bolsters the Court's finding that Galindo was salaried.[6]

The parties also disputed whether Galindo's primary duty was management and whether he regularly directed the work of at least two other employees. Again, the record shows that he satisfies these criteria.

An employee's "primary duty" is their "principal, main, major or most important duty." 29 C.F.R. § 541.700(a). Whether exempt work is an employee's primary duty depends upon all the facts of the case, "with the major emphasis on the character of the employee's job as a whole." *Id.* Relevant factors include: the employee's relative freedom from direct supervision, the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee, the relative importance of the exempt duties

---

[6] The Court also finds that Galindo remained less than fully credible. For example, he testified that he did not know how to use a cellphone to text, but he also admitted that he was able to use a complex, diagnostic computer, and he further admitted to sending, via text, certain messages and photographs admitted into evidence.

7

compared to nonexempt duties, and the amount of time spent on exempt work. *Id.* Though time alone is not the sole test, it can be a particularly useful guide: "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Still, not spending more than 50 percent of time performing exempt work does not preclude a finding that exempt work is an employee's primary duty. *Id.*

In this case, the evidence confirms that Andres Galindo served as a supervisor or foreman for Piper. His payroll records include time dedicated to "supervision." He testified that he was responsible for opening the office when he arrived in the morning, including turning off the alarm (the alarm code was his birthday), [228] at 80; he had keys to the office. *Id.* at 43, 45, 79. Galindo assigned the workers to particular crews, routes, and trucks. *Id.* at 100. If crews needed additional firewood, another truck, or additional assistance with a load, they called Galindo, and he dispatched more wood, another truck, or additional workers. *Id.* at 100–101.

Galindo testified that the office communicated with him about logistics and other matters relating to equipment, jobs, etc. And, when asked why the office would text or communicate with him, Galindo testified that it was because he was "a foreman" or "a supervisor." *Id.* at 103. Galindo assigned workers to specific crews and tasks each morning; Piper provided Galindo with a company cellphone and paid the bill for that phone, *id.* at 79–80; Piper provided Galindo with a car allowance of $500 per month, and this was a perk Piper provided to Galindo only, *id.* at 80, 82.

Galindo testified that assigning jobs took 15 to 20 minutes, and then he spent the rest of the day mulching. But the minimal supervision reflects the nature of the work; the fact remains that whatever supervisor/administrative tasks needed to be done were done by Galindo. *See Millikan v. Town of Ingalls*, No. 21-1859, 2022 WL 3928516, at *2 (7th Cir. Aug. 31, 2022) (finding that the concurrent performance of "nonmanagerial work"—including manual labor—does not disqualify a manager from exempt status if he remains "responsible for the success or failure of" the company's operations).

The testimony of other witnesses confirmed Galindo's supervisory role.[7] Alfredo Nicacio testified that, in the morning, one of the supervisors would bring out the assignment sheets for the jobs from the office and put them on the table; when asked to name the supervisors, Nicacio named Ron, Andres Galindo, sometimes Steve, sometimes Holly. [228] at 119, 122. Nicacio testified that Galindo and Ron supervised mulch installation, *id.* at 124, and that Galindo also supervised the tree crews. Nicacio testified that Galindo "would take the sheets out, and he would be the one to tell us what to do for the firewood and for the mulch." *Id.* at 129. Nicacio testified that Galindo was in charge of the yard during the period from 2018 to 2021. *Id.* at 133. Finally, Nicacio testified that, when he received a raise, it came from Steve Piper, but Piper solicited input from the managers, including Galindo. *Id.* at 126.

---

[7] Among other things, Galindo ordered parts and supplies for company work or asked Holly to order parts and supplies; he got his sons and his sons' brothers-in law jobs at Piper. His job was coded as "supervisor"; the alarm code at the property was Galindo's birthday; and he signed orders and deliveries on behalf of the company.

9

Fermin Carranza similarly testified that Galindo served as his supervisor and assigned him work. Carranza specifically said Galindo was his supervisor, *id.* at 148, and he testified that Galindo assigned his work and told him what to do. *Id.* at 142, 144, 148. Carranza testified that the tree crews would communicate with Galindo regarding the status of deliveries; if they were "falling behind, then he would send us help so that we could finish on time." *Id.* at 147, 150. Carranza testified that, if he needed to leave work early, he spoke to Galindo about that and Galindo sometimes told him "no." *Id.* at 148.

Junior also testified that his father served as his foreman, directing him as to what work needed to be performed. [229] at 122, 125.

Finally, to be exempt, an employee must have the authority to hire or fire, or their suggestions about "hiring, firing, advancement, promotion or any other change of status" must be given "particular weight." 29 C.F.R. § 541.100(a)(4). Galindo disputes that he satisfied these criteria. But Piper carried its burden of showing that he did.

The parties stipulated that Steve Piper hired or authorized the firing of every company employee. [229] at 49. But Galindo testified that he told several people to apply for jobs at Piper, including his sons, Andres Galindo Jr., Jose Fernando Galindo, and Hector Galindo, as well as Rojal Hernandez, [228] at 68–69; he testified that he told Piper he had two or three people if he needed anybody, and those people filled out the forms and were hired. *Id.* at 69. He recommended that Piper hire his sons and the company hired them. *Id.* at 74, 77.

10

Nicacio's testimony also suggests that Galindo had input concerning hiring and firing: he testified that Galindo sometimes failed to assign him work on Saturdays and often badgered him about his work, but Nicacio did not complain about the way Galindo treated him because he was worried Galindo would recommend that Piper fire him. [228] at 133. The Court finds this testimony credible and finds that Galindo had input when it came to hiring and firing.

### III.  Conclusion

For the reasons explained above, the Court finds that Plaintiff Andres Galindo remains exempt under the FLSA. The parties shall file a status report by April 15, 2026, proposing next steps to advance the case and showing any cause as to why the Court should not enter judgment in Defendant's favor as to Galindo.

Dated: March 26, 2026                    ENTERED:

Judge John Robert Blakey
United States District Court

11